UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

SEAN PETER FLANAGAN, ET AL.,,

    Plaintiffs,

v.

ALTRIA GROUP, INC., and PHILIP
MORRIS USA, INC.,

    Defendants.
_____/

Case No. 05-71697

Honorable Nancy G. Edmunds

## ORDER GRANTING DEFENDANT'S MOTION FOR SUMMARY JUDGMENT AS TO COUNT I OF COMPLAINT [20]

This case comes to the Court on Defendant's[1] Motion for Summary Judgment. For the reasons discussed below, the Court GRANTS Defendant's Motion as to Count I of Plaintiff's Complaint. Because the parties's briefs do not address Count II of the complaint, the Court will forego decision on that issue.

I.    Background

Plaintiff's complaint alleges, among other things, that Defendant engaged in the following "deceptive acts and practices" in the labeling and promotion of Cambridge Lights and Marlboro Lights cigarettes:

    a.     Falsely and/or misleadingly representing that [its] product is "light" and/or delivers "lowered tar and nicotine" in comparison to regular cigarettes;

---

[1]Defendant Altria Group, Inc., is the parent company of Defendant Philip Morris U.S.A., Inc. For the sake of simplicity, these parties are referred to singularly as "Defendant."

    b.    Designing cigarettes to register lowered tar and nicotine levels under machine testing conditions while actually delivering higher levels of these compounds when smoked by consumers, thereby rendering the "light" product descriptor deceptive and misleading;

    c.    Placing ventilation holes on the filter of light cigarettes that are covered or blocked by the smoker's lips or fingers under normal use, thereby negating the represented effects of the light brand;

    d.    Manipulating the nicotine levels in [its] cigarettes;

    e.    Employing techniques that purportedly reduce machine-measured levels of tar in [its] Cambridge Lights and Marlboro Lights cigarettes, including increased air dilution through the use of ventilation holes in or near the filter, but which actually increase the mutagenicity (genetic and chromosomal damage) of tar delivered to the consumer and thereby increase the level of harmful toxins per milligram of notice by the consumer; and

    f.    Manipulating the design of [its] Cambridge Lights and Marlboro Lights cigarettes, including but not limited to, modifying the tobacco blend, weight, rod length and circumference; using reconstituted tobacco sheets and/or expanded tobacco; increasing smoke pH levels by chemical processing and additives, such as ammonia, in such a way that resulted in delivery of greater amounts of tar and nicotine when smoked under actual conditions than Defendant[] represent by use of the "light" product descriptor.

Pl.'s Compl. 8-9. In short, Plaintiff alleges that Defendant designed its cigarettes to dupe the machine that measures tar and nicotine content, and then, through use of the descriptors "Lights" and "Lowered Tar and Nicotine," misled consumers about the actual tar and nicotine content of the cigarettes. This conduct, Plaintiff alleges, violated the Michigan Consumer Protection Act ("MCPA"), M.C.L. § 445.901 *et seq.*, and constituted unjust enrichment under common law.[2]

---

[2]Because the parties have not specifically addressed the issue of unjust enrichment, the Court will forego judgment.

Defendant has moved the Court for summary judgement based on (1) Express preemption of Plaintiff's claims under federal law, (2) Implied preemption of Plaintiff's claims under the implied conflict preemption doctrine, and (3) Exemption from the state law cause of action.

II.  Standard of Review

Summary judgment is appropriate only when there is "no genuine issue as to any material fact and the moving party is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(c).  The central inquiry is "whether the evidence presents a sufficient disagreement to require submission to a jury or whether it is so one-sided that one party must prevail as a matter of law." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 251-52 (1986).  Rule 56(c) mandates summary judgment against a party who fails to establish the existence of an element essential to the party's case and on which that party bears the burden of proof at trial.  *Celotex Corp. v. Catrett*, 477 U.S. 317, 322-23 (1986).

The moving party bears the initial burden of showing the absence of a genuine issue of material fact.  *Id.* at 323.  Once the moving party meets this burden, the non-movant must come forward with specific facts showing that there is a genuine issue for trial. *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986).  In evaluating a motion for summary judgment, the evidence must be viewed in the light most favorable to the non-moving party.  *Adickes v. S.H. Kress & Co.*, 398 U.S. 144, 157 (1970).  The non-moving party may not rest upon its mere allegations, however, but rather "must set forth specific facts showing that there is a genuine issue for trial."  Fed. R. Civ. P. 56(e). The mere existence of a scintilla of evidence in support of the non-moving party's position

3

will not suffice. Rather, there must be evidence on which a jury could reasonably find for the non-moving party. *Hopson v. DaimlerChrysler Corp.*, 306 F.3d 427, 432 (6th Cir. 2002).

III. Discussion

    A.    The Michigan Consumer Protection Act

The Michigan Consumer Protection Act ("MCPA"), upon which Plaintiff brings this case, exempts from liability a "transaction or conduct specifically authorized under laws administered by a regulatory board or officer acting under statutory authority of this state or the United States." Mich. Comp. Laws § 445.904(1)(a).

In *Smith v. Globe Life Insurance Co.*, 597 N.W.2d 28 (Mich. 1999), the Michigan Supreme Court gave new[3] meaning to this provision:

> [W]e conclude here that, when the Legislature said that transactions or conduct "specifically authorized" by law are exempt from the MCPA, it intended to include conduct the legality of which is in dispute. Contrary to the "common-sense reading" of this provision by the Court of Appeals, we conclude that the relevant inquiry is not whether the specific misconduct alleged by the plaintiffs is "specifically authorized." Rather, it is whether the general transaction is specifically authorized by law, regardless of whether the specific misconduct alleged is prohibited.

*Id.* at 38. Thus, without regard to legality, this Court must determine whether Defendant's "general transaction [was] specifically authorized by law . . . ." *Id.*

In *Smith*, the conduct at issue was the sale of credit life insurance. The court held that the conduct was "specifically authorized" because the defendant had, pursuant to a state

---

[3]One commentator argues that *Smith* may have spelled the end of what was once "one of the broadest and most powerful consumer protection acts in the country." Gary M. Victor, *The Michigan Consumer Protection Act: What's Left after* Smith v. Globe?, 82 Mich. B. J. 22, 23 (2003). "As a result of [*Smith*], the MCPA has entered a new era. Indeed, there may be little left of the power to protect consumers that the legislature had in mind when it passed the act." *Id.* at 25.

statute, submitted the necessary application and certificate of insurance forms to the State Commissioner of Insurance, and had implicitly been approved for the policy. *Id.* at 36-37. The court distinguished a previous case in which the defendant's "general transaction," mortgage writing, had not been "specifically authorized" under his real estate broker's license. *Id.* at 37-38 (discussing *Attorney General v. Diamond Mortgage Co.*, 327 N.W.2d 805 (Mich. 1982)).

In a footnote, the court declined to heed a concurring justice's invitation to provide examples of cases in which a complaint would *not* be exempt. *Id.* at 38 n.12 (responding to Cavanagh, J.). Some lower state courts, however, have given context to the issue. For example, in *Baker v. Arbor Drugs, Inc.*, 544 N.W.2d 727 (Mich. Ct. App. 1996), a case predating *Smith* but apparently left undisturbed, the court held that a fraud claim based on advertising was not exempt, because advertising fell outside of the purview of the regulatory agency, the Michigan Board of Pharmacy. *Id.* at 732. In *Kraft v. Detroit Entertainment, L.L.C.*, 683 N.W.2d 200 (Mich. Ct. App. 2004), the court held that a fraud claim based on the deceptive use of slot machines was exempt because the operation of slot machines was regulated and specifically authorized by the Michigan Gaming Control Board, whose administrative rules "specifically authorized defendants to operate the slot machines at issue . . . ." *Id.* at 204-05. And in *Newton v. Bank West*, 686 N.W.2d 491 (Mich. Ct. App. 2004), where the plaintiffs alleged that a bank had improperly charged them mortgage fees, the court found it "abundantly clear" that "federal savings banks making residential mortgage loans are engaged in transactions specifically authorized under laws administered by a regulatory board or officers acting under United States statutes," and that "state savings banks making residential mortgage loans are engaged in transactions

5

'specifically authorized' under laws administered by officers acting under both state and federal statutes." *Id.* at 493-94.

Some federal courts have also weighed in on the issue. Three cases in the Eastern District of Michigan have found claims exempt for reasons similar to those discussed above. *See Burton v. William Beaumont Hosp.*, 373 F. Supp. 2d 707, 720-22 (E.D. Mich. 2005) (claims based on hospital billing practice exempt because state statute governed health facility billing practices); *Mills v. Equicredit Corp.*, 294 F. Supp. 2d 903, 910 (E.D. Mich. 2003) (improper lending practices claim exempt because defendant bank "was a licensed mortgage lender under a Michigan law that was regulated by the Commissioner of the Office of Financial and Insurance Services of the Department of Consumer and Industry Services"); *Wheeling, Inc. v. Stelle*, 2000 U.S. Dist. LEXIS 8628, *18-19 (E.D. Mich. 2000) (securities fraud claim exempt because the "sale of securities is regulated by the Michigan Uniform Securities Act, which is administered by the Corporation and Securities Bureau of the Michigan Department of Commerce"). One Western District case, however, permitted some MCPA claims to go forward, though the specific conduct at issue was arguably regulated by Michigan and federal law. *Watson v. Damon Corp.*, 2002 U.S. Dist. LEXIS 27084, *25-26 (2002). Watson was decided in 2002, and relies on the court's finding that the MCPA's exemption provision "has only been applied by the Michigan courts to areas of heavy regulation, such as insurance and mortgages." *Id.* at 26. Whether that was true in 2002, the above cases make clear that MCPA's exemption provision has now been applied in a number of contexts.

    B.    Federal Authorization

Plaintiff argues that there has not been "any action by the FTC which 'authorized' Defendant[] to intentionally manipulate the design of Marlboro Lights and Cambridge Lights to register lower levels of tar and nicotine on the [FTC] testing machine than would be delivered by consumers." Br. of Pl. 22. Plaintiff may be correct, but this argument misses the point. The relevant inquiry is not whether the FTC authorized fraud, but "whether the general transaction [was] specifically authorized by law, regardless of whether the specific misconduct alleged is prohibited." *Smith*, 597 N.W.2d at 38.

Pursuant to authority derived from Congress, the Federal Trade Commission ("FTC") has been actively involved in the regulation of cigarette advertising for over seventy years. Peterman Aff. ¶ 25.[4]  In 1959, in reaction to the tobacco industry's use of divergent techniques for measuring tar content, the FTC effectively banned use of the words "tar" and "nicotine" in cigarette advertising. *Id.* ¶ 34. In 1966, however, the FTC reversed its position, due largely to a relative consensus in favor of encouraging the use of lower tar and nicotine cigarettes, as opposed to full-flavor brands. *Id.* ¶¶ 52-55.

Shortly thereafter, the FTC persuaded manufacturers to agree voluntarily to use a standardized tar and nicotine test, called the FTC Method,[5] which consists of a machine that consistently "smokes" cigarettes the same way and to the same length. The smoke

---

[4]Many of these facts are derived from the affidavit of John L. Peterman, former Director of the FTC's Bureau of Economics. Defendant has presented this affidavit in support of its Motion; Plaintiff has moved to strike the affidavit as inadmissible under Fed. R. Civ. P. 56(e) and Fed. R. Evid. 702. The Court has denied Plaintiff's Motion to Strike the Affidavit. In any event, it appears that most facts from the Affidavit discussed in this Order can be verified independently through publicly available documents.

[5]The parties dispute the correct name of this method, but for the sake of clarity and consistency, it is referred to here as the FTC Method. That appears to be the most commonly used name.

content is collected on a pad, which is then measured per the FTC Method for tar and nicotine content. *Id.* ¶¶ 59-61. The manufacturers' voluntary agreement with the FTC remains in effect today, under which all cigarette advertisements must contain a legend stating, "___ mg. 'tar', ___ mg. nicotine, av. per cigarette by FTC method." Peterman Aff. ¶¶ 59-70; Def.'s Ex. 18 (*FTC Nicotine Program: Hearing before the Subcomm. on Transp., Tourism, and Hazardous Materials of the H. Comm. on Energy and Com.*, 100th Cong. 6-8, 45-47 (1988)); Def.'s Ex. 48 (Letter from Horace R. Kornegay, The Tobacco Institute, Inc., to FTC, Dec. 17, 1970).

Defendant points out that the FTC has repeatedly evaluated the FTC Method, and has never abandoned it. For example, the FTC ruled in 1978 that a cigarette manufacturer could not report the tar and nicotine levels of its reformulated cigarettes because the new numbers differed from the FTC's latest published levels, even though the new numbers were *higher* than they had been under the latest reported test using the FTC method. Peterman Aff. ¶¶ 77-78. That decision took the form of an advisory opinion in a fact-specific case, at a time when all testing was performed by the FTC itself, unlike the present regime in which the Tobacco Industry Testing Lab performs testing under FTC scrutiny. *Id.* at ¶ 72 & n. 128. Nevertheless, it is clear that the FTC has for years been actively involved in the enforcement of the appropriate use of the tar and nicotine legend.

To the extent that Plaintiff alleges that use of the tar and nicotine legend on Defendant's product and advertisements is fraudulent, that claim is exempt. There is little question that Defendant was "specifically authorized" to report tar and nicotine levels per the FTC Method on their cigarettes and advertisements. Hence, notwithstanding the allegedly fraudulent misrepresentations behind this reporting, any claims about the tar and

nicotine legend are exempt. Plaintiff points out, however, that it is Defendant's use of "descriptors"—the words "Lights" and "Lowered Tar and Nicotine" on its cigarette packaging and advertising—which forms basis of this lawsuit.

The FTC has not regulated the use of descriptors in the same way as it has the tar and nicotine legend. The FTC has never required cigarette manufacturers to use terms such as these, and in fact is currently investigating whether it is even appropriate to use the descriptors "low tar" and "lights." Peterman Aff. ¶ 6. Nor has the FTC even expressly permitted Defendant to use descriptors. The evidence demonstrates, however, that the FTC has impliedly authorized Defendant's conduct.

Defendant cites two FTC opinions in which the FTC has authorized the use of descriptors such as Defendant's. The first case, *In re American Brands, Inc.*, FTC Docket No. 8799, August 20, 1971 (Def.'s Ex. 87), prohibited the respondent from comparing the tar and nicotine levels of its own brand of cigarettes with those of different brands without also disclosing all material facts necessary to inform consumers. Mr. Peeler explains, however, the decision does not *authorize* anything:

> Well, what this order does is not—this order doesn't affirmatively permit anything. What this order does is say what you can't do and it says you can't use any of these terms unless you provide a disclosure of the tar and nicotine content in the smoke produced by the advertised cigarette and if the tar content of the advertised brand is compared to that of another brand or brands of cigarettes the tar and nicotine content of—the milligrams of the smoke produced by that brand or those brands and the tar and nicotine content and milligrams of the lowest yield domestic cigarette.

*Id.* at 460-61.

The second case is similar. There, the FTC again prohibited certain types of misleading characterizations, but clarified its ruling by stating that the respondent's use of

9

the terms "low," "lower," or "lowest" would not, standing alone, constitute a violation of the Order. *In the matter of the American Tobacco Co.*, FTC Docket No. C-3547, Jan. 3, 1995 (Def.'s Ex. 92). While these cases did not explicitly authorize *Defendant's* conduct, they may very well have provided guidance to Defendant in its decision whether to use the descriptors "Lights" and "Lowered Tar and Nicotine." Indeed, C. Lee Peeler, Deputy Director of the FTC's Bureau of Consumer of Protection, states that one of the reasons for publishing decisions such as these is "to give guidance to other industry members about what type of conduct [the FTC] would challenge." Dep. of C. Lee Peeler, *United States of America v. Philip Morris, Inc., et al.*, Vol. II, July 31, 2002, pp. 464-65 (Def.'s Ex. 36).

Another potential basis for Defendant's authorization is a 1966 letter from the FTC to the National Association of Broadcasters, which states,

> [T]he Commission's current enforcement policy in regard to statements of, and representations relating to, tar and nicotine content of cigarettes may be formulated as follows: As a general rule, the Commission will not challenge such statements or representations where they are shown to be accurate and fully substantiated by tests conducted in accordance with the standardized testing methods and procedures used by the Federal Trade Commission . . . . Advertisements which correctly report official FTC tar and nicotine yields data are within this category . . . . [A] cigarette testing relatively low, or among the lowest, in comparison with other brands may be so represented in advertising it to the public, provided that the basis for comparison is fully and fairly stated.

Letter from Joseph W. Shea, Sec'y, FTC, to Howard H. Bell, Dir., Code Auth., Nat'l Ass'n of Broad., Oct. 25, 1967 (Def's Ex. 80). Although this letter was written to the National Association of Broadcasters, it was made public for policy reasons, presumably to offer guidance to companies such as Philip Morris.

Defendant also describes a 1992 FTC investigation as "reaffirm[ing] that terms such as 'low tar' and 'lights,' if substantiated by FTC Method results, were not deceptive, but

10

were in 'the public interest.'" Br. of Def. 10 (citing Peterman Aff. ¶ 137). The exhibits, however, do not support this conclusion. Although the FTC did in fact investigate use of the descriptors, it never "reaffirmed" anything, unless Defendant is referring to the fact that "the FTC did not take legal action" based on the investigation. Peterman Aff. ¶ 137. This provided no "specific authorization" for Defendant's use of descriptors.

Finally, Defendant refers to the FTC's adoption of a fifteen milligram threshold for describing cigarettes as "low tar." Defendant's descriptor, however, does not use the term "low tar"; it uses the term "Low*ered* Tar and Nicotine." In its 1979 Report to Congress (which Mr. Peterman cites as authority, Peterman Aff. ¶ 133 n. 256), the FTC itself states that "The FTC has not defined 'ultra-low tar', or *any term related to 'tar' level except for 'low tar',* which the FTC defines as 15.0 mg. or less tar. As a result advertisers use a variety of terms to distinguish among 'tar' levels." Fed. Trade Comm'n, Rep. to Cong. Pursuant to Fed. Cigarette Labeling and Adver. Act 11 n.8 (1979) (Def.'s Ex. 82). Thus, this report does not appear to authorize the use of the term "lowered tar" as Defendant has used it.

The FTC's regulatory scheme is not the only possible source of federal authorization. In 1965, following the release of a landmark report by the U.S. Surgeon General on the adverse health effects of smoking, Congress enacted the Federal Cigarette Labeling and Advertising Act (FCLAA), 15 U.S.C. § 1331 *et seq.*, which sought to "establish a comprehensive Federal program to deal with cigarette labeling and advertising with respect to any relationship between smoking and health . . . ." *Id.*

Under the FCLAA, Congress mandated that all cigarettes and cigarette advertisements contain certain health warnings, which have taken the form of the now-familiar SURGEON GENERAL'S WARNING labels found on tobacco products and

advertisements. Furthermore, in an effort to ensure uniformity, Congress pre-empted governmental rulemaking bodies from prescribing additional warnings. A 1969 amendment to the FCLAA expanded the preemption provision, which now provides, "No requirement or prohibition based on smoking and health shall be imposed under State law with respect to the advertising or promotion of any cigarettes the packages of which are labeled in conformity with the provisions of this Act." 15 U.S.C. § 1334(b).

In summary, the FTC's regulatory scheme impliedly authorizes Defendant's use of the "Lights" and "Lowered Tar and Nicotine" descriptors, while the purpose of the FCLAA is to govern that very conduct.

Based on a review of this evidence, an Illinois trial court recently found that "[n]either the FCLAA nor any regulation of the FTC governs the conduct at issue in this case—Philip Morris' voluntary use of 'Lights' and 'Lowered Tar and Nicotine' descriptors on its cigarette packages." *Price v. Philip Morris, Inc.*, 2003 WL 22597608 at *21 (Ill. Cir. Ct. Madison County, March 21, 2003) (citing *Sprietsma v. Mercury Marine,* 537 U.S. 51, 64-68 (2002)). *Price*, however, was obviously not confronted with the specific issue of MCPA preemption.

Another recent case out of the Eighth Circuit is also helpful. In *Watson v. Philip Morris Cos., Inc.*, 2005 WL 2036292 (8th Cir. 2005), the court concluded that determining "whether [Defendant's] labeling of cigarettes as 'lights' is deceptive directly implicates the enforcement and wisdom of the FTC's tobacco policies." *Id.* at *9. *Watson* presented the court with facts that were identical to the present case, as well as an analogous issue—application of the Federal Officer Removal Statute in the context of cigarette advertising. Philip Morris sought to remove the case to federal court on the grounds that it was acting at the behest of the FTC in using the "Lights" descriptor. Among its findings,

the court determined that the FTC directs and controls the advertising of cigarettes, that the FTC's regulation of testing and marketing is "extraordinary," that the FTC compels tobacco manufacturers to advertise tar and nicotine ratings per the FTC Method, and that "claims that it is deceptive for [Defendant] to use a low tar descriptor in conjunction with its cigarettes' FTC rating . . . is the same combination the FTC requires to *not* be deceptive." *Id.* at *4-9 (emphasis in original). *Watson* provides compelling authority for Defendant's argument that the FTC has been directly involved in its use of descriptors.

In light of this authority, and especially in light of the Michigan courts' liberal definition of "specifically authorized" under the MCPA's exemption provision, the Court finds that Defendant's alleged conduct falls outside the reach of the MCPA. The Court agrees that under "a common-sense reading" of the MCPA, "authorized" should not include "illegal." *Smith v. Globe Life Ins. Co.*, 565 N.W.2d 877, 884 (Mich. Ct. App. 1997), *rev'd*, 597 N.W.2d 28 (Mich. 1999). But that is not the law in Michigan. Defendant's "general transaction" was the *labeling and advertising* of its cigarettes. The FCLAA "establish[es] a comprehensive Federal program to deal with cigarette *labeling and advertising* . . . ." 15 U.S.C. § 1331 (emphasis added). Defendant's conduct is therefore exempt from the MCPA.

IV. Conclusion

Being fully advised in the premises, having read the pleadings, and for the reasons set forth above, the Court hereby GRANTS Defendant's Motion for Summary Judgment as to Count I of the Complaint. This Order leaves Count II, unjust enrichment, for further litigation. In the Court's opinion, the parties have not adequately addressed the merits of that claim.

        s/Nancy G. Edmunds
        Nancy G. Edmunds
        United States District Judge

Dated:  October 25, 2005

I hereby certify that a copy of the foregoing document was served upon counsel of record on October 25, 2005, by electronic and/or ordinary mail.

        s/Carol A. Hemeyer
        Case Manager